| | | |
|---|---|---|
| HERO LANDS COMPANY, L.L.C. | * | NO. 2022-CA-0224 |
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| CHEVRON U.S.A. INC.; | | FOURTH CIRCUIT |
| TOTAL PETROCHEMICALS | * | |
| & REFINING USA, INC.; | | STATE OF LOUISIANA |
| PIONEER NATURAL | * * * * * * * | |
| RESOURCES, INC.; KEY | | |
| OPERATING & PRODUCTION | | |
| COMPANY, L.L.C.; KEY | | |
| EXPLORATION COMPANY; | | |
| WAGNER OIL COMPANY; | | |
| HILCORP ENERGY I, L.P.; | | |
| MANTI OPERATING | | |
| COMPANY; AND | | |
| HENDERSON OIL COMPANY, | | |
| INC. | | |

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 64-320, DIVISION "A"
Honorable Kevin D. Conner, Judge
* * * * * *
**Judge Rachael D. Johnson**
* * * * * *

(Court composed of Judge Sandra Cabrina Jenkins, Judge Paula A. Brown, Judge Rachael D. Johnson)

**JENKINS, J., CONCURS IN THE RESULT**

James R. Swanson
H.S. Bartlett III
Lance C. McCardle
E. Blair Schilling
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170

Gladstone N. Jones, III
Bernard E. Boudreaux, Jr.
Kevin E. Huddell
Emma E.A. Daschbach
John T. Arnold
JONES SWANSON HUDDELL DASCHBACH LLC
601 Poydras Street

2655 Pan American Life Center
New Orleans, LA 70130

S. Jacob Braud
BALLAY, BRAUD & COLON, PLC
8114 Highway 23, Suite 101
Belle Chase, LA 70037

COUNSEL FOR PLAINTIFF/APPELLANT

Martin A. Stern
Raymond P. Ward
Alexandra Roselli Lamb
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

Michael R. Phillips
Claire E. Juneau
Jeffrey J. Gelpi
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112

Louis Victor Gregoire, Jr.
Richard D. McConnell, Jr.
John C. Funderburk
KEAN MILLER LLP
II City Plaza
400 Convention Street, Suite 700
Baton Rouge, LA 70802

Robert E. Meadows (pro hac vice)
Tracie J. Renfroe (pro hac vice)
Elizabeth R. Taber (pro hac vice)
Mitchell B. Bryant (pro hac vice)
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, TX 77002

COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED**
**March 7th, 2023**

This "legacy litigation"[1] is an environmental pollution case related to decades of oil and gas production in the Stella Oil and Gas Field in Plaquemines Parish, Louisiana. Plaintiff Hero Lands Company, LLC ("Hero"), owns approximately 155 acres of land (the "Property") south of Belle Chasse, Louisiana, which is divided into four tracts: the Northeast Tract; the Northwest Tract; the Southeast Tract; and the Southwest Tract.[2] On March 5, 2018, Hero filed suit

---

[1] As outlined in more detail later in this Opinion, "legacy litigation" is a type of oil and gas pollution case that landowners have filed following the Louisiana Supreme Court's decision in *Corbello v. Iowa Prod. Co.*, 02-0826 (La. 2/25/03), 850 So.2d 686. "These types of actions are known as 'legacy litigation' because they often arise from operations conducted many decades ago, leaving an unwanted 'legacy' in the form of actual or alleged contamination." *Marin v. Exxon Mobil Corp.*, 09-2368, 09-2371, p. 1 (La. 10/19/10), 48 So.3d 234, 238, n. 1 (citing Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006*, 20 TUL. ENVT. L.J. 347, 34 (Summer 2007)).

[2] Hero's petition describes the Property as being comprised of two tracts, namely Tract A and Tract B. Subsequent pleadings, however, indicate that the Property is divided into four tracts, namely the Northeast, Northwest, Southeast, and Southwest Tracts. Because many of the issues on appeal describe the Property in four tracts, we use the four-tract description throughout this Opinion unless the two-tract description is explicitly referenced. In Hero's petition, Tract A and Tract B are described as follows:

> **Tract A (southern tract):**
>
> Located in Section 2 of Township 15 South, Range 24 East and Section 18 of Township 14 South, Range 24 East, west of the Mississippi River, Plaquemines Parish, Louisiana. Being a portion of Oak Point Plantation, bound on the southwest and northwest by the property now or formerly of the Joint Reserve Training Center, Alvin Callender Field, New Orleans (Belle Chasse), LA., bound on the northeast by the southwesterly line of Concord Canal Subdivision, and bound on the southeast by the centerline of Belle Chasse Highway (Louisiana Route #23).

1

against: (1) Chevron U.S.A., Inc. ("Chevron"); (2) Total Petrochemicals & Refining USA, Inc.; (3) Pioneer Natural Resources, Inc.; (4) Key Operating & Production Company, L.L.C.; (5) Key Exploration Company; (6) Wagner Oil Company ("Wagner"); (7) Hilcorp Energy I, L.P. ("Hilcorp"); (8) Manti Operating Company; and (9) Henderson Oil Company, Inc. (collectively, "Defendants"), alleging the Property incurred substantial harm due to Defendants' conduct and asserted both tort and breach of contract claims. After conclusion of the trial, the jury found that the Northwest Tract did not contain any "environmental damage" under Act 312, codified at La. R.S. 30:29.[3] The jury further concluded that neither Chevron nor its assignees or lessees[4] operated excessively or unreasonably on any of the Property's four tracts.

---

**Tract B (fronting Mississippi River):**

Located in Section 2 of Township 15 South and Sections 16, 17, and 18 of Township 14 South, all in Range 24 East, West of the Mississippi River, Plaquemines Parish, Louisiana.

A portion of Oak Point Plantation and Lilly Concord Plantation, bound on the west by the centerline of the Belle Chasse Highway (Louisiana Route #23), bound on the north by the line of division between Section 16 and Section 15, bound on the east by the low water's edge of the Mississippi River, and bound on the south by the northerly line of the property of New City Company.

Lots H, I, J, and J of the Concord Canal Subdivision located on the west side of the Belle Chasse Highway.

Less and except the property sold to Buck Kreihs Company and property now or formerly of the Joint Reserve Training Center, Alvin Callender Field, New Orleans (Belle Chasse) LA.

[3] Act 312, which provides for judicial resolution of claims for environmental damages to property, will be more fully discussed, *infra*.
[4] Throughout the pleadings and testimony in the instant litigation, the parties and their expert witnesses have used the terms "assignees" and "sublessees" to describe the relationship between Chevron and some of the other Defendants. The trial court's Verdict Form and May 14, 2021 partial final judgment, however, uses the terms "assignees" and "lessees" to refer to those same entities.

The trial court entered a partial final judgment on May 14, 2021, dismissing Hero's claims against Chevron in accordance with the jury's verdict. This appeal followed. For the reasons discussed below, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Factual Background

Hero's predecessor and Chevron's predecessor entered into multiple leases beginning in 1939 in order to develop oil and gas natural resources on Hero's Property. Three of these leases are at issue in the instant appeal, namely the Delta 5 Minerals Lease, the Delta 4 Minerals Lease, and the Surface Lease for State Lease 458 ("Surface Lease"). It is undisputed that Chevron constructed and utilized a system of unlined separation pits to direct "produced water"[5] from drainage ditches into Bayou Barriere and eventually into the Intercoastal Waterway. It also is undisputed that, in 1943, an accidental oil spill occurred on the Property.

In 1967, an internal memorandum from Chevron addressed the existence of two citations[6] from the Enforcement Division of the Department of Conservation. Also in 1967, another oil spill occurred on the Property. In 1970, the Stream Control Commission fielded a complaint from Alvin Callender Naval Station (the "Station"), situated adjacent to the Property, concerning brine and oily wastes in the drainage canals on the Station. Hero elected to build a new drainage ditch that ran parallel to the Station's property line, and Chevron paid for the construction.

---

[5] "'Produced water' is a term used to describe the waste byproduct of the extraction of oil and gas from wells." *Marin*, 09-2368, 09-2371, p. 3, 48 So.3d at 240, n.5.

[6] It is undisputed that the underlying citations have not been found and that they are not part of the record in the instant appeal.

In 1971, Congress enacted the Federal Water Quality Improvement Act of 1970, which required Chevron to apply for a permit to maintain its practice of discharging "produced water" into the Intracoastal Waterway through its separation pits and drainage ditch system. The Stream Control Commission certified that Chevron's practices were compliant with the new legislation, and Chevron applied to the United States Army Corps of Engineers for the required permit. Internal correspondence from Chevron reveals that, in contemplating selling or assigning its interests in the Property, the current "produced water" disposal system into the Intracoastal Waterway was less expensive than other methods. Chevron acknowledged that without a permit to comply with the Federal Water Quality Improvement Act of 1970, the costs associated with installing and maintaining an alternative disposal system would cause continued operations on the Property to be "economically unattractive."

While Chevron's permit application was pending, Chevron assigned its mineral lease interests on the Property to Energy Corporation of America ("Energy"). Thereafter, new rules[7] re-classified Bayou Barriere as "waters of the state," prohibiting discharge of "produced water" and oil into Bayou Barriere through the separation pits and drainage system that Chevron had installed. Following the implementation of these new rules, the Louisiana Department of Natural Resources ("LDNR") and the Louisiana Department of Environmental Quality ("LDEQ") issued numerous compliance orders to Energy as well as to its parent corporation, Equitable Petroleum Corporation ("Equitable"), beginning in 1983. Energy installed saltwater disposal wells, and Energy and Equitable entered

_____

[7] The pleadings in the instant appeal, as well as at least one expert at trial, allude to the implementation of new rules but fail to provide citations or names for these rules.

4

into a settlement with the State in 1985 to complete the required upgrades and remediation work in response to the compliance orders. Nevertheless, Energy and Equitable received additional compliance orders concerning the Property as late as 1991.

Hero was aware of potential environmental damage on the Property as early as 1989. At that time, Hero obtained an environmental site assessment report from another surface lessee concerning a portion of the Property. In 1995, Chevron Chemical Company provided Hero with "data and testing results" from a "surface and subsurface investigation" that indicated "topographic irregularities" and "elevated levels of chromium, barium, and sodium" as well as "total petroleum hydrocarbons" and "chloride in the soil samples collected from the areas where the surface" of the Property "appeared stressed." Hero subsequently obtained independent laboratory reports concerning potential environmental pollution on the Property as early as 2004, with other independent test results and studies occurring in 2007.

**Procedural History**

In Hero's petition, Hero alleged that the Property incurred substantial harm due to Defendants' conduct and asserted both tort and breach of contract claims. Hero expressly acknowledged the possibility that Act 312 applied to the instant suit, as Hero requested remediation damages pursuant to Act 312 as well as all costs, expenses, and reasonable attorneys' fees[8] in accordance with Act 312.

Hero filed a motion for partial summary judgment that leases were breached and any damages may not be limited ("Hero's Breach of Leases and Damages

---

[8] A related case, *Hero Lands Co., L.L.C. v. Chevron U.S.A. Inc., et al*, 2022-CA-0383, pertaining to attorneys' fees and costs, is currently pending before this Court.

Motion") on May 19, 2020. In Hero's Breach of Leases and Damages Motion, Hero argued that Defendants breached the leases at issue in this appeal because they conducted their operations on the Property "in a manner that violated the law, as confirmed by multiple compliance orders." Hero further argued that Chevron's representatives conceded that Chevron's assignees' operations were unreasonable and excessive. Therefore, Hero asserted that Hero's damages under Act 312 should not have been limited to the costs associated with funding the "most feasible plan" pursuant to La. R.S. 30:29(M)(1)(a).

Chevron filed an opposition to Hero's Breach of Leases and Damages Motion on June 26, 2020, along with an objection and motion to strike. In Chevron's opposition, Chevron first contended that Hero was incorrect in arguing that "evidence of purported regulatory violations by an assignee of Chevron are tantamount to breaches of the mineral and surface leases at issue," especially in light of the fact that the "regulations were not in effect during the time that Chevron operated on the property" and therefore "should not be used to find that Chevron breached" any of the leases at issue in this appeal. Next, Chevron argued that Hero failed to provide any legal basis "to impute any alleged regulatory violations of" Energy or Equitable to Chevron such that Chevron breached any of the leases at issue in this appeal. Third, Chevron asserted that Hero's reliance on the Louisiana Court of Appeal for the Third Circuit's ("Third Circuit") decision in *State v. La. Land & Exploration Co.*, 19-248 (La. App. 3 Cir. 5/6/20), 298 So.3d 296 ("*Third Circuit LL&E*"), was misplaced and that the decision itself "is not final, is contradicted by extensive case law, involves an interpretation of an inapplicable version of Act 312, and is subject to withdrawal or revision because" a writ was pending to the Louisiana Supreme Court at the time Chevron filed its

6

opposition. Finally, Chevron argued that Hero's contention that any damages may not be limited to the cost of funding the most feasible plan under Subpart M of Act 312, should the trial court conclude that either Chevron or its assignees acted unreasonably or excessively, was wrong because "the quantum of damages is clearly disputed and must be left to the jury."

In a September 21, 2020 judgment and written reasons, the trial court ordered that Act 312 applied retroactively to the instant action. The trial court granted, in part, Hero's Breach of Leases and Damages Motion, "to the extent that [Act 312] does, under specified circumstances, permit recovery of damages beyond what the 'feasible plan' allows" pursuant to Subpart M of Act 312. The trial court denied, in part, Hero's Breach of Leases and Damages Motion "insofar as there are issues of material fact to be decided by the jury as to whether Chevron's performance was 'excessive' or 'unreasonable' as contemplated by" Subpart M of Act 312. The trial court further denied, in part, Hero's Breach of Leases and Damages Motion because the trial court concluded it could not find "that [D]efendants' operations on the leases at issue were in breach as a matter of law based solely on numerous environmental compliance orders they received."

### Chevron's Limited Admission

On July 30, 2020, Chevron made a Limited Admission pursuant to Subpart C of Act 312 ("Chevron's Limited Admission"). In Chevron's Limited Admission, Chevron acknowledged Chevron's predecessor had entered into a surface lease as well as mineral leases with Hero's predecessors in order to perform oil and gas operations on the Property. Chevron further acknowledged that it operated on the Property between 1940 until 1971, when Chevron sold its operating interests and leases. Concerning Act 312, Chevron admitted that environmental damage existed

7

on all tracts except the Northwest Tract of the Property and that Chevron was a responsible party pursuant to Act 312, but only for any damage Chevron caused. On July 30, 2020, Chevron filed a motion for referral to the LDNR for the development of the "most feasible plan," and on July 31, 2020, the trial court ordered Chevron to develop a "most feasible plan" to submit to LDNR and file with the trial court on August 24, 2020. The trial court further ordered Hero "or any other party" to file a response within 30 days of Chevron's filing the "most feasible plan" with the trial court. Finally, the trial court ordered the LDNR to file with the trial court a "schedule of estimate costs for review of the plans or submittals of the parties."

### *Hero's Act 312 Motion to Strike*

Hero filed a motion to strike Chevron's Limited Admission pursuant to Act 312 ("Hero's Act 312 Motion to Strike") on August 17, 2020. In Hero's Act 312 Motion to Strike, Hero argued that Chevron's Limited Admission should be excluded because it would cause "undue delay and unfair prejudice" under La. C.E. art. 403. Hero further argued that allowing Chevron's Limited Admission to stand would give Chevron a "tactical benefit" from a prior trial continuance and "would fundamentally alter the nature of the information presented to the jury at the trial—especially when Act 312 imposes a rebuttable presumption that the [LDNR's] plan is the best cleanup plan." Additionally, Hero argued that Chevron's Limited Admission "lack[ed] the sufficiency, substance, and accountability required by Act 312" and moved to have the trial court either strike Chevron's Limited Admission or order Chevron to amend Chevron's Limited Admission.

8

The trial court heard Hero's Act 312 Motion to Strike on October 19, 2020. In a December 2, 2020 judgment and written reasons, the trial court denied Hero's 312 Motion to Strike.

### *Chevron's Motions* in Limine

Chevron filed a motion *in limine* to deem evidence and argument on Act 312 admissible at trial and for a jury instruction on Act 312 ("Chevron's Act 312 Motion *in Limine*") on February 5, 2021. In Chevron's Act 312 Motion *in Limine*, Chevron argued that Hero had already conceded in Hero's petition that Act 312 applied to the instant action and that Chevron's Limited Admission, the "most feasible plan" approved by the LDNR, and all written agency comments are admissible as evidence in the instant suit pursuant to La. C.C.P. art. 1563(A)(3). Chevron further argued that evidence and argument concerning Act 312 was relevant pursuant to La. C.E. art. 402 due to Hero's allegations in Hero's petition and that the trial court was required to instruct the jury concerning applicable law in accordance with La. C.C.P. art. 1792(B). Additionally, Chevron argued that failure to allow argument and jury instructions concerning Act 312 would prejudice Chevron, but including the instructions would not prejudice Hero because Hero's petition expressly included claims for damages under Act 312.

Chevron also filed a motion *in limine* to exclude certain arguments and evidence from trial ("Chevron's Exclusion Motion *in Limine*") on March 15, 2021. In Chevron's Exclusion Motion *in Limine*, Chevron sought to exclude, among other issues, evidence or argument concerning Chevron's liability under the Surface Lease to clean up "all damages" as well as Chevron's liability for "all damages" based on compliance orders that various Louisiana agencies had issued.

9

In an April 19, 2021 judgment, the trial court granted Chevron's Act 312 Motion *in Limine* because the parties agreed that evidence and argument on Act 312 was admissible pursuant to La. C.C.P. art. 1563(A)(3). The trial court granted Chevron's Exclusion Motion *in Limine*, in part, to the extent it concerned Chevron's liability under the Surface Lease to clean up "all damages." The trial court denied Chevron's Exclusion Motion *in Limine*, in part, deferring until trial the portions of the motion that concerned Chevron's liability for "all damages" based on the compliance orders various Louisiana agencies had issued.

### *Hero's Motions* **in Limine**

Hero filed a motion *in limine* regarding Act 312 Evidence ("Hero's Act 312 Motion *in Limine*") on March 18, 2021 as well as an opposition to Chevron's Act 312 Motion *in Limine*. In Hero's Act 312 Motion *in Limine*, Hero contended that La. C.C.P. art. 1563(A)(3) limits the scope of what is admissible at trial concerning Act 312. Hero further contended that Chevron's proposed plan failed to comport with the requirements of Article IX, Section 1 of the Constitution of Louisiana.[9] Additionally, Hero asserted that it was premature for the trial court to rule on the admissibility of Chevron's plan pursuant to La. C.C.P. art. 1563(A)(3) because the LDNR had not yet approved Chevron's plan or issued it to the parties in the instant action. Finally, Hero argued that any evidence concerning Act 312 should be limited so as to avoid jury confusion.

---

[9] Article IX, Section 1 of the Constitution of Louisiana provides that "[t]he natural resources of the state, including the air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people" and requires the Louisiana Legislature to "enact laws to implement this policy." Act 312 is one such law. *See* La. R.S. 30:29(A).

Hero filed a second motion *in limine* ("Hero's Exclusion Motion *in Limine*") on March 23, 2021 in which Hero sought to exclude evidence and argument concerning numerous issues, including any references to Act 312.

On April 7, 2021, the LNDR submitted to the trial court its "most feasible plan" along with written reasons pursuant to Act 312. The LNDR "partially approved" Chevron's proposed plan but essentially developed a "most feasible plan" based on what Chevron submitted, public hearing, a motion *in limine* that Hero submitted, and post-hearing briefs. While the LDNR explained that "further remediation or delineation . . . may be required once investigation and delineation is complete," the LDNR found that "[t]he combined total cost for the known remediation and soil treatment areas, further delineation of constituents of concern and groundwater monitoring is $2,173,317."

In an April 19, 2021 judgment, the trial court denied, in part, Hero's Act 312 Motion *in Limine* concerning the admissibility of evidence and argument on Act 312 at trial because La. C.C.P. art. 1563(A)(3) "provides that Act 312 evidence 'shall be' admissible, subject to articles 702 through 705 of the Code of Evidence and Article 1425 of the Code of Civil Procedure." Moreover, the trial court "deem[ed] that the monetary figure the [LNDR] arrived at in its most feasible plan [was] admissible as evidence at trial" in accordance with La. C.C.P. art. 1563(A)(3). Additionally, the trial court denied Hero's Exclusion Motion *in Limine* "to the extent that it seeks to exclude evidence pertaining to Act 312 from trial."

### *Jury Instructions and Trial*

Chevron submitted proposed jury instructions as well as a verdict form on April 6, 2021, and Hero submitted proposed jury instructions and jury

11

interrogatories on April 7, 2021. Both parties' proposed jury instructions contained specific instructions pertaining to Act 312 as well as Chevron's Limited Admission. Both parties objected to each other's proposed jury instructions. Chevron filed revised proposed jury instructions as well as a verdict form on May 3, 2021. The trial court provided proposed jury instructions and a verdict form on May 6, 2021. The trial court's proposed jury instructions also contained specific instructions as to Act 312 and Chevron's Limited Admission. Chevron and Hero objected to the court's proposed jury instructions and verdict form on May 7, 2021, with Hero filing supplemental objections on May 14, 2021.

The instant suit went to trial from April 26, 2021 until May 7, 2021. At the time of trial, the only remaining defendants were Chevron, Hilcorp, and Wagner, as all other defendants had either settled or were dismissed. Hero also filed a motion for partial voluntary dismissal of all of Hero's tort claims, with prejudice, which the trial court granted on April 27, 2021. Following Hero's case in chief, the trial court dismissed Wagner and Hilcorp by directed verdict. At the conclusion of the trial, the jury unanimously rendered a verdict in favor of Chevron and against Hero. Specifically, the jury found that no environmental damage existed on the Northwest Tract. The jury also found that neither Chevron nor its assignees or lessees operated unreasonably or excessively on any of the four tracts of the Property. The trial court entered a partial final judgment on May 14, 2021 in accordance with the jury's verdict. In the partial final judgment, the trial court dismissed all of Hero's claims against Chevron with prejudice. The trial court ordered Chevron to file a separate motion to tax costs should Chevron elect to assess costs against Hero. The trial court further reserved all claims for attorneys' fees and costs in accordance with La. C.C.P. art. 1563(A)(6) and set the matter for

12

hearing on July 19, 2021.  Finally, the trial court retained post-trial jurisdiction pursuant to Act 312 "for all purposes including but not limited to adopting, funding, and overseeing the most feasible plan."

### *Hero's Motion for JNOV/Motion for New Trial*

Hero filed a motion for judgment notwithstanding the verdict, or alternatively, a motion for new trial on May 26, 2021 ("Hero's Motion for JNOV").  In Hero's Motion for JNOV, Hero sought a judgment notwithstanding the verdict that environmental damage exists on the Northwest Tract of the Property and that Chevron, Chevron's assignees, or Chevron's sublessees performed their operations on the Property unreasonably or excessively.  In the alternative, Hero sought a motion for a new trial on those same issues.  Hero argued that it was undisputed that there was environmental damage on the Northwest Tract and that "significant uncontroverted evidence was presented at trial demonstrating that Chevron or its assignees or sublessees conducted unreasonable or excessive operations."

Chevron filed an opposition to Hero's Motion for JNOV on July 9, 2021.  In its opposition, Chevron argued that neither a judgment notwithstanding the verdict nor a motion for a new trial was warranted.  As to the jury's finding that no environmental damage existed on the Northwest Tract, Chevron contended that "this issue is moot because the jury absolved Chevron from liability."  Additionally, Chevron asserted that the totality of the evidence supported the jury's conclusions that no environmental damage existed on the Northwest Tract and that neither Chevron nor Chevron's assignees conducted their operations on the Property in an unreasonable or excessive manner.

13

The trial court heard Hero's Motion for JNOV on July 19, 2021. In an August 10, 2021 judgment and written reasons, the trial court denied Hero's Motion for JNOV. In the trial court's written reasons, the trial court explained that both Chevron and Hero provided "copious testimony from experts" and that the trial court could not "find that the trial evidence points so strongly in favor of Hero that reasonable men could not reach different conclusions." Moreover, the trial court further concluded that it could not "find that the jury's verdict is unsupported by any competent evidence."

Hero filed a motion for devolutive appeal on August 26, 2021, which the trial court granted the same day. This appeal followed.

## DISCUSSION

Hero raises six assignments of error on appeal, arguing that the trial court erred when it: (1) denied, in part, Hero's Breach of Leases and Damages Motion, as to whether Chevron or Chevron's assignees or sublessees operated unreasonably or excessively; (2) entered a partial final judgment in accordance with the jury's verdict that Chevron and Chevron's assignees' and lessees' conduct was not unreasonable and excessive; (3) entered a partial final judgment in accordance with the jury's verdict that there was no environmental damage on the Northwest Tract; (4) denied Hero's Motion for JNOV on the issue that Chevron and Chevron's assignees' and sublessees' operations were unreasonable and excessive; (5) denied Hero's Motion for JNOV on the issue that environmental damage existed on the Northwest Tract; and (6) improperly instructed the jury on Act 312. Before addressing the merits of Chevron's assigned errors, we find a review of the applicable law and the legislative history of Act 312 necessary.

14

**Act 312**

In 2006, the Louisiana Legislature enacted Act 312, codified at La. R.S. 30:29, in response to the Louisiana Supreme Court's landmark decision in *Corbello v. Iowa Production*, 02-0826 (La. 2/25/03), 850 So.2d 686, which "dramatically increased the profile and extent of [legacy] litigation in Louisiana alleging environmental damage arising from oil and gas exploration and production operations." Loulan J. Pitre, Jr., & D'Ann R. Penner, *Legacy Litigation—What is Reasonable Behavior in the Oilfield?*, 28 TUL. ENVT. L.J. 333, 34 (Summer 2015) (citing Mary Beth Balhoff, Comment, Corbello v. Iowa Production *and the Implications of Restoration Damages in Louisiana: Drilling Holes in Deep Pockets for Thirty-Three Million Dollars*, 65 LA. L. REV. 271, 271 (2004)). In *Corbello*, the Louisiana Supreme Court "decline[d] to set forth a rule of law . . . that in cases of breach of a contractual obligation of restoration in a lease, the damage award to plaintiffs must be tethered to the market value of the property." 02-0826, p. 9, 850 So.2d at 695. Additionally, the Louisiana Supreme Court allowed the plaintiffs in *Corbello* to recover restoration damages while under no obligation to use those damages for property remediation. *Id.* at pp. 20-21, 850 So.2d at 701.

Three years later, the Louisiana Legislature enacted Act 312, which changed the procedure by which landowners could sue for environmental damage from oil and gas exploration activities by requiring damages to be placed into the registry of the court as part of a "most feasible plan" to remediate the environmental damage. *See M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, p. 30 (La. 7/1/08), 998 So.2d 16, 36 ("Act 312 adopts a procedure and simply seeks to ensure that the property that is environmentally damaged is actually remediated.").

The Louisiana Supreme Court summarized the "six basic components" of Act 312 as follows:

> First, the act requires timely notice of such litigation to the State. Second, the act stays the litigation until thirty days after notice is given. Third, the act permits the State to intervene in the litigation. Fourth, the act provides a role for the Office of Conservation with the [LDNR] in the determination of the most feasible plan for evaluation and/or remediation of environmental damage. Fifth, the act provides for the payment of all damages for the evaluation or remediation of environmental damages and further provides that the Court shall oversee actual implementation of the plan adjudicated to be 'most feasible.' Sixth, the act allows the landowner and the State to recover attorney and expert fees, as well as costs from the responsible party or parties.

*M.J. Farms*, 07-2371, p. 29 (La. 7/1/08), 998 So.2d 16 at 36 (internal citations omitted).

Another aspect of Act 312 that is of significance to the instant appeal is a party's ability to make a limited admission of liability for environmental damage under Subpart C of Act 312. When a party makes such an admission, it is required to "develop a plan or submittal for the evaluation or remediation to applicable standards of the contamination that resulted in the environmental damage." La. R.S. 30:29(C). The court ensures that the admitting party develops and submits the proposed plan to the LDNR and allows any party to file a response within 30 days, including an alternative plan. *Id.* The LNDR considers the admitting party's plan as well as any responses, and the court requires the admitting party to deposit "sufficient funds to pay the cost" of the LNDR's "review of the plans or submittals." *Id.* The LDNR is required to "conduct a public hearing on the plan or plans submitted" and "approve or structure a plan based on the evidence submitted." *Id.* The LDNR is also required to "issue written reasons for the plan it

approves or structures." *Id.* The court then "adopt[s] the plan approved by the [LNDR], unless a party proved by a preponderance of the evidence that another plan is a more feasible plan," and "enter[s] a judgment adopting the plan with written reasons assigned." *Id.* The court must also order the admitting party to "deposit funds for the implementation" of the plan "into the registry of the court." *Id.*

With respect to damages, Subpart D of Act 312 requires that "all damages or payments in any civil action, including interest thereon, awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing to account for the cleanup." La. R.S. 30:29(D). The court "retain[s] jurisdiction over the funds deposited and the party or parties admitting responsibility . . . until such time as the evaluation or remediation is completed." *Id.* If the initial deposit of funds is insufficient, the court can order the admitting party to supplement the funds with an additional deposit. *Id.* If funds still remain in the registry of the court upon completion of the remediation work, then the court is required to order the return of the funds to the admitting party. *Id.* Subpart H of Act 312 provides that Act 312 does not "preclude an owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage." La. R.S. 30:29(H). Moreover, "[a]ny award granted in connection with the judgment for additional remediation in excess of the requirements of the feasible plan adopted by the court is not required to be paid into the registry of the court." *Id.*

The Louisiana Supreme Court has interpreted the 2006 version of Act 312 in contemplating the availability of remediation damages above and beyond the cost

of funding the most feasible plan in three decisions in the same case. In the first decision ("*LL&E I*"), the Louisiana Supreme Court held that Act 312 "d[id] not prohibit the award of remediation damages for more than the amount necessary to fund the statutorily mandated feasible plan." *State v. La. Land & Expl. Co.*, 12-0884, p. 16 (La. 1/30/13), 110 So.3d 1038, 1049. In the second decision ("*LL&E II*"), the Louisiana Supreme Court held that the prior decision contained "findings" that "were palpable error" and that "outside of an express contractual provision, Act 312 d[id] not allow for remediation damages in excess of those required to fund the court adopted remediation plan." *State v. La. Land & Expl. Co.*, 20-00685, pp. 10-12 (La. 6/30/21), 347 So.3d 684, 691-93. In the third decision ("*LL&E III*"), the Louisiana Supreme Court affirmed *LL&E II* on rehearing to hold that "the plain language of Act 312 only allows recovery of excess remediation damages when expressly provided by contract." *State v. La. Land & Expl. Co.*, 20-00685, p. 3 (La. 6/1/22), 339 So.3d 1163, 1166 (per curiam).

In 2014, the Louisiana Legislature enacted Act 400, which contained several amendments to Act 312. It is undisputed that the 2014 version of Act 312 applies to the case *sub judice*, and amendments to Subparts C and H as well as the addition of Subpart M are pertinent to the instant appeal. With respect to Subpart C, the Louisiana Legislature added language that when a party makes a limited admission of liability pursuant to La. C.C.P. art. 1563(A)(3), "there shall be a rebuttable presumption that the plan approved or structured by the [LDNR], after consultation with [LDEQ] as appropriate, shall be the most feasible plan to evaluate or remediate to applicable regulatory standards the environmental damage for which responsibility is admitted." La. R.S. 30:29(C)(2)(c). Moreover, in jury trials, the

18

trial court is required to "instruct the jury regarding this presumption if so requested by a party." *Id.*

With respect to Subparts H and M, the Louisiana Legislature added considerable language concerning damages under Act 312. First, the Louisiana Legislature amended Subpart H to provide that damages awarded pursuant to Act 312 "shall be governed" by Subpart M and that Act 312 "shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease." La. R.S. 30:29(H)(2). Next, the Louisiana Legislature added Subpart M in its entirety, which provides:

> M. (1) In an action governed by the provisions of this Section, damages may only be awarded for the following:
> (a) The cost of funding the feasible plan adopted by the court.
> (b) The cost of additional remediation only if required by an express contractual provision providing for remediation to original condition or to some other specific remediation standard.
> (c) The cost of evaluating, correcting, or repairing environmental damage upon a showing that such damage was caused by unreasonable or excessive operations based on rules, regulations, lease terms and implied lease obligations arising by operation of law, or standards applicable at the time of the activity complained of, provided that such damage is not duplicative of damages awarded under Subparagraph (a) or (b) of this Paragraph.
> (d) The cost of nonremediation damages.
> (2) The provisions of this Subsection shall not be construed to alter the traditional burden of proof or to imply the existence or extent of damages in any action, nor shall it affect an award of reasonable attorney fees or costs under this Section.

La. R.S. 30:29(M).

As Act 312 is a procedural statute, we look to underlying substantive law outlined in Subpart M to determine what constitutes unreasonable and excessive operations under a mineral lease, which "must be determined on a case by case

19

basis." *Broussard v. Northcott Expl. Co.*, 481 So.2d 125, 129 (La. 1986). "The issue thus presents a question of fact which is subject to the manifest error standard of review." *Caskey v. Kelly Oil Co.*, 98-1193, p. 15 (La. 6/29/99), 737 So.2d 1257, 1265 (citing *Canter v. Koehring Co.*, 283 So.2d 716 (La. 1973)).

"A lessee's obligations under a mineral lease are governed by the Mineral Code and the Louisiana Civil Code." *Marin*, 09-2368, 09-2371, p. 29, 48 So.3d at 255 (citing La. R.S. 31:2). Article 122 of the Mineral Code requires the lessee "to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor." La. R.S. 31:122. It also allows the parties of a mineral lease to "stipulate what shall constitute reasonably prudent conduct on the part of the lessee." *Id.*

In addition to the Mineral Code, "[t]he Civil Code lease provisions require the mineral lessee to perform certain restoration obligations during the lease term, and these obligations are governed by Civil Code articles 2683, 2686, 2687, and 2692." *Marin*, 09-2368, 09-2371, p. 30, 48 So.3d at 255. La. Civ. Code art. 2683 requires the lessee, in pertinent part, "[t]o return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear or as otherwise provided hereafter." Moreover, La. Civ. Code art. 2692 requires the lessee "to repair damage to the thing caused by his fault . . . and to repair any deterioration resulting from his . . . use to the extent it exceeds the normal or agreed use of the thing."

Whether an operator performed unreasonably or excessively is based on whether the operations exceeded ordinary "wear and tear" as provided in the terms of the lease itself. *Caskey*, 98-1193, p. 5, 737 So.2d at 1261 ("An oil, gas, and mineral lease is a contract by which the lease is granted the right to explore for and

produce minerals.  We thus look to the Mineral Code, along with the contract of lease between the parties, to define the parties' respective rights and obligations.") (internal citation omitted).  "In determining what constitutes necessary 'wear and tear' in a particular case, it is useful to consider the character of the specific rights granted in the lease.  The lessor may be considered to have given his assent to the 'wear and tear' normally involved in exercising the rights granted." *Terrebonne Par. Sch. Bd. v. Castex Energy, Inc.*, 04-0968, p. 16 (La. 1/19/05), 893 So.2d 789, 800.

With these precepts in mind, we now turn to Hero's assigned errors.  Where appropriate, we will address assignments of error together based on the nature of the issues presented.

### *Hero's Breach of Leases and Damages Motion*

As to the first assignment of error, Hero argues that the trial court erred when it denied, in part, Hero's Breach of Leases and Damages Motion because the leases at issue in the instant action were "breached as a matter of law by unreasonable and excessive conduct by violations of state statutes and regulations." Hero further contends that the trial court failed to take into account the relevant statutory language of Act 312 as well as statements Chevron's representatives made before and at trial, which Hero asserts are judicial confessions.  We disagree. Based on our review of the entire record, genuine issues of material fact existed that rendered summary judgment inappropriate.

Typically, "[a]ppellate courts review the grant or denial of a motion for summary judgment *de novo*, using the same criteria applied by trial courts to determine whether summary judgment is appropriate." *Chatelain v. Fluor Daniel Constr. Co.*, 14-1312, p. 3 (La. App. 4 Cir. 11/10/15), 179 So.3d 791, 793 (quoting

21

*Mandina, Inc. v. O'Brien*, 13-0085, p. 8 (La. App. 4 Cir. 7/31/13), 156 So.3d 99, 104). "[O]nce a case is fully tried," however, "the affidavits and other limited evidence presented with a motion for summary judgment—later denied by the district court—are of little or no value." *Hopkins v. Am. Cyanamid Co.*, 95-1088, p. 13 (La. 1/16/96), 666 So.2d 615, 624. Accordingly, "[a]ppellate courts should not rule on appeal after a full merits trial on the strength alone of affidavits in support of a motion for summary judgment that was not sustained in the district court." *Id.* Rather, "appellate courts should review the entire record." *Id.*

Hero argues that the trial court's denial of Hero's Breach of Leases and Damages Motion "wholly ignored Chevron's admission that its assignees' operations were unreasonable" and "instead only analy[zed] the effect of the" compliance orders Chevron's assignees received. Hero further argues that the trial court "failed to analyze the import of the statutory language at issue," as "the statutory entitlement to damages under Act 312 expressly invokes 'rules [and] regulations' as the basis for unreasonable and excessive operations." Additionally, Hero relies on *Third Circuit LL&E* to contend "that, with regard to oilfield pollution cases specifically, the violation of laws and regulations governing operations under the applicable mineral and surface leases must be treated as a breach of those leases."

Chevron contends that "the jury could reasonably find that the oil-and-gas operations on [the] Property were not unreasonable and excessive." To that end, Chevron further contends that the jury's decision to agree with Chevron's experts and reject Hero's experts concerning whether Chevron or Chevron's assignees or sublessees operated in an unreasonable or excessive manner cannot be manifestly

22

erroneous. Additionally, Chevron asserts that their experts did not make any judicial confessions concerning excessive or unreasonable operations.

Subpart M of Act 312 indicates that damages are allowed for "unreasonable or excessive operations based on rules, regulations, lease terms and implied lease obligations arising by operation of law, or standards applicable at the time of the activity complained of, provided that such damage is not duplicative of damages awarded" for funding the "most feasible plan" or damages awarded according to an express contractual agreement between the parties. La. R.S. 30:29(M). While the compliance orders in and of themselves are certainly evidence in support of Hero's argument that Chevron and its assignees operated unreasonably or excessively, there is considerable other evidence in the record that created genuine issues of material fact as to whether their operations were excessive or unreasonable even in light of the compliance orders they received.

Moreover, as the express language of Subpart M of Act 312 indicates, rules and regulations are only a portion of the grounds by which an oil and gas production entity may be found to have conducted its operations in an unreasonable or excessive matter. In reviewing the entire record, other factors such as the express terms of the leases at issue in this appeal and industry "standards applicable at the time of the activity complained of" created additional issues of material fact as to whether Chevron or Chevron's assignees operated unreasonably or excessively. La. R.S. 30:29(M). Thus, we agree with the trial court that it was inappropriate to conclude that either Chevron or Chevron's assignees' operations "were *per se* unreasonable or excessive based solely on the fact that the environmental compliance orders were issued."

At trial, the jury heard the testimony of multiple witnesses. With regards to Chevron's compliance orders and operations, Charles Norman, P.E. ("Mr. Norman"), a petroleum and operational engineer, testified that Chevron's operations concerning Chevron's methods for saltwater disposal were unreasonable. He further testified that Chevron "knew that the saltwater disposal system was inadequate" by 1971 based on an internal Chevron memorandum. Essentially, Mr. Norman confirmed that Chevron was "not following good practices" and that Chevron was "[v]ery unreasonable and reckless and allowing a lot of water, a lot of oil, a lot of pollution to get in the soil and – at the tank battery sites and also in the ditches."

Kerry Mire ("Mr. Mire"), Chevron's corporate representative, testified that the 1943 oil spill "was a violation of a regulation in place on that day." Mr. Mire further testified that an internal Chevron memorandum indicated that "the ground was very dry at the time so the oil readily soaked up" and that there was no "indication that there was money spent pulling out 702 barrels from the soaked up soil." Based on his experience, however, Mr. Mire explained that "spills happen" and that it is important to understand how they are addressed in the field. To that end, Mr. Mire testified that the 1943 oil spill was a "significant spill" and that Chevron "wouldn't have just left all this oil-wet soil there" because Chevron had a burning pit on site that Chevron would typically use to dispose of that kind of waste. He further testified that leaving the oil-soaked soil "would have interfered with operations" and posed "a safety issue." Additionally, Mr. Mire testified that there is no "oil signature" on the site where the 1943 oil spill occurred according to testing in the area. Based on his review of Chevron's records, Mr. Mire also testified that no other spills happened during Chevron's operations on the Property.

Concerning the 1967 Chevron internal memorandum that discusses the existence of two underlying citations for saltwater discharge, it is undisputed that the citations themselves are not part of the record on appeal. As to their significance concerning whether Chevron operated unreasonably or excessively, Mr. Mire testified that the underlying citations were effectively "overturned" because the Stream Control Commission approved Chevron's method of saltwater discharge after the Office of Conservation had issued the underlying citations.

In regards to Chevron's use of pits, Mr. Mire testified that their use "was very common" and that "every oilfield had them in coastal Louisiana." He further testified that "regulatory agencies, even, in some cases, required them." Concerning Chevron's saltwater disposal methods, Mr. Mire testified that Chevron's system of separation pits and ditches that discharged saltwater into the Intracoastal Canal "was a common practice in coastal Louisiana" at the time of Chevron's operations. Accordingly, Mr. Mire testified that Chevron "follow[ed] the rules and regulations in place at the time for how it handled saltwater."

Richard Kennedy, P.E. ("Mr. Kennedy"), a professional engineer and operations expert, testified that "Chevron's operations were lawful under the rules and regulations and consistent with industry practice." He further testified that Chevron's performance under the leases at issue in this appeal was "consistent with industry practices of the day" based on "operational documents" and "agency documents." With respect to the 1970 complaint from the Station concerning the discharge of oily waste and saltwater through the Station's ditches, Mr. Kennedy testified Chevron was willing to address the issue even though Hero Board minutes suggested that "none of the lands of the Hero interests could be responsible for the suggested contamination unless it was off lands under lease." To that end, Mr.

25

Kennedy testified that Chevron paid for the construction "to reroute the ditch" and that "[t]his episode reinforces the fact that the Stream Control [Commission] was aware of the discharge" and that it was "legal and approved by the Louisiana Stream Control Commission."

With respect to the Northwest Tract, Mr. Norman testified that Energy was Chevron's sublessee and that "Chevron operated" on the Northwest Tract pursuant to an agreement Chevron had with Jayred "to produce and gauge Jayred's production." Mr. Norman further testified that Chevron's operations "were very unreasonable" on the Northwest Tract. Additionally, Mr. Norman testified that a citation was issued in 1967 for improper discharge coming from a pit on the Northwest Tract. Conversely, Mr. Mire testified that Jayred was the operator on the Northwest Tract and that Chevron never operated on the Northwest Tract. Mr. Mire further testified that although there was a gauging agreement between Chevron and Jayred on the Northwest Tract, "Jayred continued to be the operator, without a doubt." Mr. Kennedy also testified that Chevron did not operate on the Northwest Tract and that Jayred was the operator on the Northwest Tract. He further testified that Hero and Jayred executed surface leases in the 1940s and that a surface lease permitted Jayred "to do all of these things on the [N]orthwest Tract, including using slush pits, and derricks, and separators." He also testified that a 1967 inspection indicated that the pits were not in satisfactory condition.

Concerning Chevron's assignees, Lynn Wellman ("Mr. Wellman"), a former LDNR employee, testified in a deposition played at trial that Energy's operations on the Property were "conducted in bad faith" and "was an example of the poorest of operations" in oil and gas production between 1982 and 1985 in comparison to other oil and gas production sites that he inspected.

26

Mr. Norman testified that Energy's operations were "of the same type" as Chevron's in that Energy "used what was already there in terms of design; open unlined earthen pits, drainage system, saltwater handling methods." Mr. Norman further testified that Chevron's assignees and sublessees "acted imprudently in a lot of different ways" based on the violations they were issued. According to Mr. Norman, Energy's operations under the Delta 4 and Delta 5 Mineral Leases just eight months after Chevron's assignment to Energy were "very unreasonable" because they were "really ignoring the environment." Mr. Norman further testified that there had "really been no change in that period of time" in terms of operations on the Property since Chevron assigned Energy its interests. Accordingly, Mr. Norman testified that operations on the Property, beginning with Chevron, were "very unreasonable" because they failed to comply with numerous compliance orders Chevron and Chevron's assignees received.

Dr. Stuart Guey, D.D.S. ("Dr. Guey"), who served on Plaquemines Parish Commission Council from 1982 to 1986 and served on Plaquemines Parish Commission Council at the time of trial, testified that he was frustrated with Energy because they failed to address problems arising on the Property and that he "felt that [the Plaquemines Parish Commission Council] had done all [it] could to cooperate with the company, in good faith" and that "[n]othing was being done." In correspondence Dr. Guey wrote to Mrs. Pat Norton, then Secretary of LDEQ, Dr. Guey explained in 1985 that while Energy "seemed willing to cooperate, the illegal discharging of oil continue[d] unabated."

Mr. Mire testified that Energy's operations were unreasonable based on the compliance orders Energy received in 1983 and 1984. In a deposition prior to trial, Mr. Mire agreed that by the time Energy received another compliance order in

1985, Energy had engaged, "in this particular case," in "terrible operating practices."

Allen Hero ("Mr. Hero"), as Hero's corporate representative, testified that Hero sued Energy in 2003 because Energy had breached its lease obligations for "failing to further explore for and develop the minerals by conducting relevant operations" under the Louisiana Mineral Code. Mr. Hero further testified he never complained about the conditions of the Property during the course of Energy's operations there, nor did he ever sue them "for the condition of the property" despite the fact that the property "look[ed] ugly" in 1986 from Highway 23.

Mr. Kennedy testified that the amount of time it took for Energy to address the 1983 and 1984 compliance orders was unreasonable in that Energy "should have been moving forward with converting" a "well to saltwater disposal." Mr. Kennedy further testified that, in the 1980s, compliance orders "were handled" and "taken care of," meaning that the entities that received them "did what they were told do to" and were accordingly "in good standing again" with the state agencies that issued them. To that end, Mr. Kennedy testified that while Energy received multiple compliance orders in the 1980s, they were not always concerning the same problem, meaning that Energy had satisfied at least some of the issuing agency's earlier concerns as they were issued other, unrelated compliance orders. Otherwise, Mr. Kennedy testified that the entities would receive multiple compliance orders for the same issue as well as the possibility of the implementation of other "legal remedies" to bring them into compliance, such as cease and desist orders, shutting in an oil field, or referring the matter to the Louisiana Attorney General. Mr. Kennedy also testified that the issuance of

compliance orders "do[es] not necessarily mean than an operator's operations are unreasonable."

As to the significance of Mr. Mire's and Mr. Kennedy's testimony, we are not persuaded that Chevron's representatives' testimony amounts to a judicial confession. Rather, we agree with Chevron that it is disserving testimony. La. Civ. Code art. 1853 provides in pertinent part that "[a] judicial confession is a declaration made by a party in a judicial proceeding" and that it "constitutes full proof against the party who made it." In *Jackson v. Gulf Ins. Co.*, the Louisiana Supreme Court explained that "the judicial confession is distinct from a party's factual testimony." 199 So.2d 886, 890 (La. 1967). The Louisiana Supreme Court further delineated the difference between disserving testimony and a judicial confession by characterizing a judicial confession as an intentional "act of waiver relating to the opponent's proof and not merely an assertion made for some independent purpose, such as a statement made for the purpose of giving testimony." *Id.* at 891 (citing *Coleman v. Jones & Pickett*, 60 So.2d 643 (La. 1912)). In contrast, the Louisiana Supreme Court highlighted that "[a] party's testimony is offered as evidence, not waiver of it" and that "[t]o be an effective agency of truth, the trier of fact must be allowed to weigh the disserving testimony of a party, as well as other evidence." *Id.* Here, it is undisputed that Chevron's corporate representative as well as Chevron's operations expert testified that Chevron's assignees, based on the compliance orders they received, operated unreasonably between 1983 and 1985. While this testimony certainly bolsters Hero's argument that Chevron's assignees engaged in what could be characterized as unreasonable and excessive behavior, we find that such testimony was "offered as evidence, not as a waiver of it." *Id.*

29

Accordingly, based on our review of the entire record, we find that the trial court correctly denied, in part, Hero's Breach of Leases and Damages Motion, as genuine issues of material fact existed concerning whether Chevron or Chevron's assignees or sublessees operated excessively or unreasonably under Subpart M of Act 312. While the compliance orders support Hero's position, they are not, in and of themselves, dispositive. The jury heard other evidence as to the significance of those compliance orders, including testimony that the issuance of a compliance order does not necessarily entail that an operator performed unreasonably or excessively. The jury also heard evidence that Chevron's practices were consistent with industry customs and that Chevron performed reasonably under the leases at issue in this appeal. As to Chevron's assignees, while Chevron's representatives conceded that Energy operated unreasonably between 1983 and 1985 due to the amount of time Energy was taking to resolve its operational issues, it is also undisputed that Energy and Equitable entered into a settlement agreement with the State in 1985. As to the significance of such a settlement agreement, the jury heard additional testimony from Mr. Kennedy that resolving a compliance order puts the operator back in "good standing." Accordingly, genuine issues of material fact existed as to whether either Chevron or Chevron's assignees or sublessees operated unreasonably or excessively, and summary judgment was inappropriate on this issue. Therefore, the trial court correctly denied, in part, Hero's breach of Leases and Damages Motion.

### Jury's Instruction Regarding Act 312

With respect to the sixth assignment of error, Hero contends that the trial court "erred in allowing the entire trial to be permeated with jury confusion as to the role of Act 312 by instructing the jury extensively on the Act 312 process" as

30

well as "allowing Chevron to elicit testimony, introduce evidence, and argue extensively to the jury about the conduct of the ["most feasible plan"] process under Act 312."

"In addressing jury instructions, the gravity of the error dictates the applicable standard of review." *PVCA, Inc. v. Pac. W. TD Fund LP*, 20-0327, p. 7 (La. App. 4 Cir. 1/20/21), 313 So.3d 320, 327 (citing *Seal v. State Farm Fire & Cas. Co.*, 00-2375, p. 4 (La. App. 4 Cir. 3/20/02), 816 So.2d 868, 872). "In considering an argument of improper jury instruction, the court should consider the entirety of the charges and determine if they adequately provide the correct principles of law applicable to the issues as framed by the pleadings and the evidence, and whether they provide adequate guidelines for the jury." *Seal*, 00-2375, p. 4, 816 So.2d 868, 872 (quoting *Clark v. Jesuit High Sch. of New Orleans*, 96-1307, p. 7 (La. App. 4 Cir. 12/27/96), 686 So.2d 998, 1002-03). A *de novo* standard of review is warranted only "when the charges are so incorrect or so inadequate as to preclude a verdict based on the law and the facts." *Clark*, 96-1307, p. 8, 686 So.2d at 1003. Otherwise, the manifest error standard of review applies. "Under the manifest error standard, this Court reviews jury instructions as a whole and in light of the circumstances of the case." *Seal*, 00-2375, p. 5, 868 So.2d at 872 (citing *Boh Bros. Const. v. Luber-Finer, Inc.*, 612 So.2d 270, 273 (La. App. 4th Cir. 1992)). "Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Adams v. Rhodia, Inc.*, 07-2110, p. 7 (La. 5/21/08), 983 So.2d 798, 804 (citing *Nicholas v. Allstate Ins. Co.*, 99-2522, p. 8 (La. 8/31/00), 765 So.2d 1017, 1023 (additional citations omitted)). We find that the appropriate standard of review in the instant action is manifest error, as the jury was able to "reach a

31

verdict based on the law and on the facts." *Clark*, 96-1307, p. 8, 686 So.2d at 1003.

Hero argues that "the entire trial was infected with extensive argument and testimony elicited by Chevron" concerning Act 312, the process of developing a "most feasible plan," the LNDR's role under Act 312, and the trial court's role "in creating and approving" a "most feasible plan" that Chevron would be required to pay. According to Hero, the trial court's "extensive opening and closing instructions to the jury" concerning various aspects of Act 312 resulted in a jury verdict form that impermissibly contained a "damages question . . . requiring the jury to consider the amount of Act 312 regulatory remedy in order to then determine what amount to award for private damages for remediation" above and beyond what the "most feasible plan" required. Hero relies on the Louisiana Supreme Court's recent decision in *LL&E III* to maintain that the trial court improperly instructed the jury concerning aspects of Act 312 "that are not part of its role in determining liability and damages for the landowner's private damages claims."

Chevron contends that Hero "failed to present an argument based on an objection it made at trial to a specific jury charge" and that the trial court did not err when it instructed the jury on Act 312. Rather, Chevron asserts that the trial court was bound to do so pursuant to La. C.C.P. art. 1563(A)(3). Chevron factually distinguishes the instant appeal from the facts in *LL&E III* and argues that, regardless, Hero's sixth assignment of error is moot because "[t]he jury never reached this [damages] question on the verdict form."

La. C.C.P. art. 1792 permits the trial court to "instruct the jury on the law applicable to any issue in the case" during the trial. Additionally, the trial court is

required, "[a]fter the trial of the case and the presentation of all of the evidence and arguments," to "instruct the jurors on the law applicable to the cause submitted to them" and "reduce such instructions to writing" so that they are "available to the parties and to jurors in their deliberations." *Id.*

La. C.C.P. art. 1563 specifically addresses the procedural significance of a party's limited admission under Subpart C of Act 312. Pursuant to La. C.C.P. art 1563(A)(2), "[t]here shall be a rebuttable presumption that the plan approved or structured by the department, after consultation with the [LDEQ] as appropriate, shall be the most feasible plan to evaluate or remediate the environmental damage," and the court is required to "instruct the jury regarding this presumption if requested by a party." La. C.C.P. art. 1563(A)(3) also provides, in pertinent part, that "[t]he limited admission, the plan approved by the [LDNR], and all written comments provided by the agencies" in accordance with Subpart C of Act 312 "shall be admissible subject to the Code of Evidence Articles 702 through 705 and Code of Civil Procedure Article 1425 as evidence in any action."

The trial court instructed the jury, in pertinent part:

> Now, Chevron, in this case made a Limited Admission under Act 312. The case is governed by a law known as Act 312. Act 312 ensures that when a party claims that property has been damaged by oil and gas operations, the impact of those operations is evaluated and, if necessary, any environmental damage is remediated to a standard that protects the public interest. And Act 312 allows any defendant to streamline the process of ensuring that damage to the environment is remediated to a standard that protects the environment and the public health, safety, and welfare by admitting responsibility under Act 312 for environmental damage.
>
> The environmental damage is defined as 'any actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and

33

production sites." Contamination is understood to mean the introduction or presence of substances or contaminants into a usable groundwater aquifer, an underground source of drinking water, or soil in such quantities as to render them unsuitable for their reasonably intended purpose.

Now, during this litigation the defendant, Chevron, made a Limited Admission of responsibility for implementing the Most Feasible Plan to evaluate, and if necessary, remediate, and this is to applicable regulatory standards any environmental damage found on the [N]ortheast, [S]outheast, and [S]outhwest [T]racts of the plaintiff's property, only. As you have heard, Act 312 refers to the steps necessary for evaluation or remediation to regulatory standards as the Feasible Plan. And under Act 312, the Feasible Plan will ultimately be approved by me, and it will be the most reasonable plan which addresses environmental damage to protect the environment, public health, safety and welfare, and is in compliance with the specific relevant and applicable standards and regulations in effect at the time of cleanup.

Now, Chevron's Limited Admission of responsibility for implementing this Feasible Plan has been admitted into evidence. This admission of responsibility under Act 312 does not waive any of Chevron's rights or defenses. The Limited Admission also is not an admission for what Act 312 refers to as the plaintiff's private claims, which are those for additional remediation in excess of the requirements of the Feasible Plan adopted by the court.

So after Chevron made its Limited Admission, the [LDNR] conducted a public hearing to determine the Most Feasible Plan to evaluate, and, if necessary, remediate any environmental damage under applicable regulatory standards to protect the health, safety, and welfare of the people.

And before this trial began, [LDNR] released what it determined to be the Most Feasible Plan for the three tracts subject to Chevron's Limited Admission. Remember, there was no admission for the [N]orthwest [T]ract.

LDNR's Most Feasible Plan has been admitted into evidence. And as you've been told, the Court will decide whether a plan should be approved as the Most Feasible Plan under Act 312. You don't have to worry about that.

There is a rebuttable presumption that the plan approved by LDNR, after consulting with the [LDEQ], shall be the Most Feasible Plan to evaluate or remediate the environmental damage for which Chevron has admitted responsibility under the applicable regulatory standards.

And unless a party proves by a preponderance of evidence that another plan is more feasible to adequately protect the environment and public health, safety, and welfare, the Court's going to adopt the plan approved by LDNR as the Most Feasible Plan.

Now, again, Chevron's Limited Admission under Act 312 does not apply to the [N]orthwest [T]ract. For that reason, you must determine whether environmental damage exists on the [N]orthwest [T]ract, and, if so, whether Chevron is legally responsible for that damage. And if you ultimately find that environmental damage exists on the [N]orthwest [T]ract and that the defendant or its assignees or sublessees is responsible, then LDNR is going to conduct proceedings after this trial has concluded to determine the Most Feasible Plan for evaluating and, if necessary, remediating that environmental damage.

The plan approved by the LDNR to address any environmental damage on the [N]orthwest [T]ract will then be returned back to me for my consideration along with the plan developed by LDNR after Chevron's Limited Admission for the [N]ortheast, [S]outheast, and [S]outhwest [T]racts. And again, you don't worry about this. I will adopt the Most Feasible Plan or plans for adequately protecting the environment and the public health, safety, and welfare. Now, the Most Feasible Plan or plans that the Court adopts is going to be funded by Chevron and any other party or parties found legally responsible for environmental damage, as determined in this trial.

And all funds necessary for the Most Feasible Plan will be deposited into the Registry of the Court and used solely to evaluate and, if necessary, remediate any environmental damage in compliance with applicable environmental standards and regulations. If the amount of the initial deposit is insufficient to complete the evaluation or remediation, the responsible party or parties will be required to file periodic progress reports on the plan's implementation.

35

Concerning the Jury Verdict Form, the trial court instructed, in pertinent part:

> Now, the Verdict [F]orm is very easy. You may have seen some outlines of it. It starts off on one page. If you could look at it, it says Verdict [F]orm. And the first two quest—or the first two questions you're going to answer pertain only to the Northwest Tract. Why? Because that's the one—there was no Limited Admission by Chevron. So you're going to have to make the determination of whether or not, in question one, do you find that environmental damage exist[s] on the [N]orthwest [T]ract? If your answer is yes, put, yes. If your answer is no, put, no. And then it'll tell you what to do, regardless of which way you answer, you'll have more instructions. If "Yes," proceed to question two. If "No," go to question three. That's the format.
>
> So just follow this, and by the time you get to the end it should be really—The decision won't be simple, but the following of the form should be simple. Okay? When you get to question three, this is the private claims. This is what you're here for, besides the other. You're also here for the other. But it says, "Do you find Chevron USA, Inc., or its assignees or lessees operated unreasonably or excessively on the following tracts?" It'll have all four tracts. Again, very easy. All of them; the [N]orthwest, [N]ortheast, [S]outhwest, [S]outheast. And you will simply check "yes," or "no."
>
> You will then go to question four. And again, when you look at the instructions here at the top it's going to tell you if you answered "Yes" to any of the choices in question three, which means that you have found— whatever your decision is on that, for the unreasonable and excessive use, then only for those tracts where you found that you will see in four. You'll go back then and it says "Do you find that Chevron or it's [sic] assignees or lessees [sic] unreasonable excessive operations were the cause of the damage to any of the following tracts?" And then you're just going to check "Yes," or "No," on that. And then it tells you on here—You'll see on here that— what to do if all your things turn out to be "No." You can read that. Example. if [sic] you answered "No" to all the choice questions in three, you just sign and date the form, return it back to my bailiff because your deliberations are complete.

36

Now, if you get to question four and there—the question indicates to you the two things that you have to answer; Is there unreasonable and excessive operations, and was it the cause of damage? If the answers to that were "Yes," then you're going to go to private damages in five. And for those tracts, whether it's one, two, three, four, or none—And if it's none you would have turned it in earlier. To whatever tracts you find, you'll put whatever you think the damage award should be on that. Okay?

So it's pretty simple and straightforward, and you will decide on that. And again, as I indicated to you, I purposely did not put in on this form to confuse you about any type of amount. But, again, as I indicated to you, make sure that when you look at these instruction [sic] in awarding monies, again, also consider defendant's affirmative defenses they had, as well. Okay? Remember, I told you you could reduce the award or make it none if you want. Or if you find that's not the case and award plaintiff, they prove their case, is entitled to whatever damages you deem to be appropriate.

Hero relies on *LL&E III* to argue that "the Louisiana Supreme Court held that a jury in an Act 312 case should not be instructed about the portions of the Act 312 process that are not part of its role in determining liability and damages for the landowner's private damages claims." We find the instant action to be legally and factually distinguishable from *LL&E III*. The instant appeal is legally distinguishable because *LL&I*, *LL&E II*, and *LL&E III* all pertain to the 2006 version of Act 312. As such, they do not fully address the significance of Subpart M in the 2014 version of Act 312, which is central to the instant appeal. Moreover, we find that the trial court's jury instructions in the case *sub judice* are factually distinguishable from the jury instructions at issue in *LL&E III*, as the Louisiana Supreme Court explained that "the misguided decision" of *LL&E I* "allowed . . . juries to decide the amount of damages necessary to remediate land to department standards." *LL&E III*, 20-00685, p. 9, 347 So.3d at 691. Here, in contrast, the

jury's role was confined to determining whether Chevron or Chevron's assignees or lessees were responsible for any environmental damage on the Northwest Tract. The jury was not asked, nor was the jury permitted, to assign a specific amount for remediation damages. Rather, the trial court only permitted the jury to contemplate awarding a specific amount of damages for Hero's private claims on any of the four tracts on the Property in accordance with Subpart M of Act 312. Moreover, as Chevron's Limited Admission did not include the Northwest Tract, we conclude that the trial court's instructions discussing procedural aspects of Act 312 were not only proper, but necessary. Without such instruction, the jury would not have been sufficiently informed why it needed to make preliminary, additional findings as to the Northwest Tract.

Consequently, given that the jury had to evaluate, as a preliminary matter, Chevron or Chevron's assignees' or lessees' responsibility for the existence of any environmental damage on the Northwest Tract before contemplating the other tracts that were the subject of Chevron's Limited Admission, we conclude that the trial court's jury instructions were necessary and proper in order to "adequately provide the correct principles of law applicable to the issues as framed by the pleadings and the evidence" as well as "to provide adequate guidelines for the jury." *Seal*, 00-2375, p. 4, 816 So.2d at 872 (citing *Clark*, 96-1307, p. 7, 686 So.2d at 1002-03). Accordingly, the trial court's jury instructions on Act 312 were not manifestly erroneous.

**Jury's Verdict and Denial of Hero's JNOV Regarding Unreasonable and Excessive Operations**

Concerning the second and fourth assignments of error, Hero again relies on *Third Circuit LL&E* to argue that the trial court erred when it entered a partial final

38

judgment in accordance with the jury's verdict as well as when it denied Hero's Motion for JNOV on the issue of the excessive and unreasonable operations of Chevron and Chevron's assignees because "there is no evidence in the record to support a finding contrary to the undisputed fact that the conduct of discharging oilfield saltwater across [the Property] through the ditch system and Bayou Barriere violated state laws and regulations, as evidenced in the repeated imposition of compliance orders on Chevron's assignees."

"A court of appeal may not set aside the jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong.'" *Harts v. Downing*, 19-0620, pp. 2-3 (La. App. 4 Cir. 6/24/20), 302 So.3d 102, 107 (quoting *Stobart v. State ex. rel Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La. 1993)). The two-part inquiry first requires the appellate court to determine "from the record that there is a reasonable factual basis for the finding of the trial court." *Mart v. Hill*, 505 So.2d 1120, 1127 (La. 1987) (citing *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La. 1979) (additional citation omitted)). Next, the appellate court is required to "determine that the record establishes that the finding is not clearly wrong (manifestly erroneous)." *Id.* "The reviewing court must review the record in its totality to determine if the factfinder was clearly wrong." *Norfleet v. Lifeguard Transp. Serv., Inc.*, 05-0501, p. 5 (La. App. 4 Cir. 5/17/06), 934 So.2d 846, 852 (citing *Stobart*, 617 So.2d at 882). Ultimately, "[t]he appellate court must determine if the factfinder's decision was a reasonable one." *Id.* "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart*, 617 So.2d at 883.

Motions for judgment notwithstanding the verdict ("JNOV") "may be granted on the issue of liability or on the issue of damages or on both issues." La.

39

C.C.P. art. 1811(F).  Moreover, La. C.C.P. art. 1811 provides that "[a] motion for a new trial may be joined with" motions for JNOV.  La. C.C.P. art. 1811(A)(2).

The Louisiana Supreme Court outlined the standard of review for a motion for JNOV in detail in *Davis v. Wal-Mart Stores, Inc.*:

> A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict.  The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.  If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.  In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

00-0445, p. 4 (La. 11/28/00), 774 So.2d 84, 89 (multiple citations omitted).  Procedurally, "[t]he standard of review for a JNOV on appeal is a two part inquiry."  *Id.*, p. 5, 774 So. 2d at 89.  First, the appellate court should utilize "the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion."  *Id.*, p. 5, 774 So.2d at 89.  Next, once the appellate court concludes "that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review."  *Id.*, p. 5, 774 So.2d at 89 (citing *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829 (La. 1991)).

In support of its argument, Hero relies on Chevron's La. C.C.P. art. 1442 deposition testimony and trial testimony in which Chevron's representative acknowledged that Chevron's assignees' conduct was unreasonable, as evidenced by the compliance orders they received.  To that end, Hero asserts that Chevron's

corporate representative testimony is a judicial confession pursuant to La. Civ. Code art. 1853 and that Chevron itself has "provided 'full proof' evidence its assignee engaged in unreasonable operations." Hero additionally argues that the trial court's failure to instruct the jury that Chevron was responsible "for the lease breached of its assignees" in the trial court's opening instructions contributed to the trial court's reversible error.

In opposition, Chevron argues that neither a judgment notwithstanding the verdict nor a motion for a new trial was warranted. Chevron contends that Chevron did not make judicial confessions. Chevron relies on the Louisiana Supreme Court's decision in *Jackson* to distinguish Chevron's La. C.C.P. art. 1442 testimony from a judicial confession. Chevron characterizes its expert testimony as its experts' "personal opinions of Energy's conduct" that "were not intended to waive the need for evidence or to relieve Hero of its burden of proof."

We find that the trial court did not err when it entered the jury's verdict that neither Chevron nor Chevron's assignees or lessees operated unreasonably or excessively. The record provides ample support to satisfy the first step of our two-part inquiry, as the jury heard testimony from several experts and ultimately agreed with Chevron's experts that neither Chevron nor Chevron's assignees or lessees operated in an unreasonable or excessive manner. Accordingly, there was a "reasonable factual basis for the finding of the trial court." *Mart*, 505 So.2d at 1127 (citing *Arceneaux*, 365 So.2d at 1333) (additional citation omitted). Nor can we find that this conclusion was "clearly wrong" under the second part of the two-part test. *Id.* Based on our review of the record, we find no manifest error in the jury's decision to agree with Chevron's experts and disagree with Hero's experts. "[W]here two permissible views of the evidence exist, the factfinder's choice

41

between them cannot be manifestly erroneous or clearly wrong." *Stobart*, 617 So.2d at 883. Accordingly, we conclude that the trial court did not err when it entered the jury's verdict on May 14, 2021 that neither Chevron nor Chevron's assignees or lessees operated unreasonably or excessively under Subpart M of Act 312.

We also find that the trial court correctly denied Hero's Motion for JNOV. In its July 19, 2021 judgment and written reasons, the trial court noted that "[a]fter two weeks of trial that included copious testimony from experts for both parties, the jury unanimously ruled in favor of Chevron and against Hero" and concluded that it could not "find that the trial evidence points so strongly in favor of Hero that reasonable men could not reach different conclusions." Accordingly, we find the first step of our two-part inquiry is satisfied because the trial court properly applied the correct standard of review.

Regarding the second step, we find no manifest error in the trial court's denial of Hero's Motion for JNOV concerning whether Chevron or Chevron's assignees or sublessees operated unreasonably or excessively. As the trial court explained, the jury heard testimony from multiple experts and ultimately agreed with Chevron's experts. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart*, 617 So.2d at 883. Finally, as Hero also moved, in the alternative, for a new trial on this issue and that the standard of review for a motion for new trial is "less stringent" than the standard of review for a motion for JNOV, we further conclude that the trial court correctly denied Hero's alternative motion for new trial. *Davis*, 00-0445, p. 10 (La. 11/28/00), 774 So.2d at 93.

***Jury's Verdict and Denial of Hero's JNOV regarding Environmental***
***Damage on the Northwest Tract***

As to the third and fifth assignments of error, Hero contends that the trial court's entering of a partial final judgment in accordance with the jury's verdict and the trial court's denial of Hero's Motion for JNOV regarding the existence of environmental damage on the Northwest Tract "simply cannot be squared with the plethora of undisputed evidence—based on the reported sampling of that tract by both Chevron's experts and Hero's experts—that contaminants found on the other three tracts also contaminated the Northwest Tract, in some cases at even greater amounts."

Hero relies on the plain language of Subpart I of Act 312, which defines "environmental damage" as "any actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and production sites." La. R.S. 30:29(I)(2). Combined with Chevron's Admission concerning the other tracts, Hero asserts that "there is nothing in the record to support a reasonable juror's verdict that there is no environmental damage on the Northwest Tract."

Chevron argues that "substantial evidence supports the jury's finding of no environmental damage on the Northwest Tract." Chevron further argues that "any comparison between the Northwest Tract and the other tracts is irrelevant" because "[o]ne tract does not set the standard for the other." Accordingly, Chevron contends that "[t]he only relevant comparison is with the relevant RECAP standards."

We conclude that the trial court did not err when it entered judgment on the jury's verdict that there was no environmental damage on the Northwest Tract. As

outlined above, Subpart I of Act 312 defines "environmental damage" as "any actual or potential impact, damage, or injury to environmental media caused by contamination resulting from activities associated with oilfield sites or exploration and production sites." La. R.S. 30:29(I)(2). Additionally, Subpart I lists "soil, surface water, ground water, or sediment" as a non-exclusive list for what constitutes "environmental media." *Id.* Lastly, "contamination" is defined as "the introduction or presence of substances or contaminants into a usable groundwater aquifer, an underground source of drinking water (USDW) or soil in such quantities as to render them unsuitable for their reasonably intended purposes." La. R.S. 30:20(I)(1).

Turning to the first part of our two-part inquiry, we find that the record supports the jury's conclusion that no environmental damage exists on the Northwest Tract. As to the Property's reasonably intended use, Mr. Mire, Mr. Kennedy, and Mr. Hero all testified that Hero has used the Northwest Tract as an oilfield. Dr. Helen Connelly, Ph.D. ("Dr. Connelly"), an environmental toxicologist, testified that the Northwest Tract was, at the time of trial, still an active oilfield.

Multiple experts also testified regarding the environmental conditions of the Northwest Tract. From an ecological standpoint, Dr. Connelly testified that there were "[n]o adverse effects to the ecology" and that the Northwest Tract's "ecosystem is in good habitat shape." Angela Levert ("Ms. Levert"), an environmental chemist and human health risk assessor, testified that the conditions of the Property as a whole, including the Northwest Tract, "are safe for both industrial and residential use." She further testified that remediation of the Property was not necessary "for human health purposes."

44

As to the groundwater on the Property, including the Northwest Tract, Ms. Levert testified that "we have naturally elevated arsenic in our soil relative to other places in the country." To that end, Ms. Levert further testified that the Property's groundwater cannot be used "for drinking water supply based on its natural constituents; arsenic being a primary concern." In agreement with the LDNR and LDEQ, Ms. Levert testified that the groundwater on the Property was Class 3 under RECAP standards, meaning that it was non-drinking water. David Angle ("Mr. Angle"), a hydrogeologist, testified that "the groundwater underneath this property, and particularly the shallow groundwater which has been the focus of the last week and a half is naturally poor quality and not potable." He further testified that the groundwater is Class 3 under RECAP standards. In terms of remediation, Mr. Angle testified that "the only remediation that is necessary is really a monitoring plan, which is what the LDNR has specified in their Most Feasible Plan."

With respect to the soil on the Property, Michael E. Pisani ("Mr. Pisani"), a licensed engineer, soil expert, and contractor who performs remediation work in oilfields, testified that on the Northwest Tract, "we'll [sic] picked up a little bit or [sic] arsenic at about four to six feet, so we've got to dig that out and take it offsite for management, to a commercial facility." Concerning the presence of salt on the Property, Mr. Pisani testified that the Property was "not contaminated" because "there is nothing inhibiting the Hero property—Hero from using his land as he would otherwise use it because of the presence of salt."

Given the testimony from multiple experts describing the Property as being suitable for its current use as an oilfield, we find that there was "a reasonable factual basis for the finding of the trial court." *Mart*, 505 So.2d at 1127 (La. 1987)

(citing *Arceneaux*, 365 So.2d at 1333 (additional citation omitted)). As to the second part of the test, we cannot find that the jury's verdict was "clearly wrong," as our review of the record indicates no manifest error in the jury's decision to conclude that the Northwest Tract's aquifer, groundwater, and soil are still suitable for its past and present use as an oilfield. *Id.*

We also find that the trial court correctly denied Hero's Motion for JNOV regarding the existence of environmental damage on the Northwest Tract. In its July 19, 2021 judgment and written reasons, the trial court noted that "[a]fter two weeks of trial that included copious testimony from experts for both parties, the jury unanimously ruled in favor of Chevron and against Hero" and concluded that it could not "find that the trial evidence points so strongly in favor of Hero that reasonable men could not reach different conclusions." Accordingly, we find the first step of our two-part inquiry is satisfied because the trial court properly applied the correct standard of review.

Regarding the second step, we find no manifest error in the trial court's denial of Hero's Motion for JNOV regarding the existence of environmental damage on the Northwest Tract. As the trial court explained, the jury heard testimony from multiple experts and ultimately agreed with Chevron's experts and that the Northwest Tract's aquifer, groundwater, and soil are still suitable for its past and present use as an oilfield. Finally, as Hero also moved, in the alternative, for a new trial on this issue and that the standard of review for a motion for new trial is "less stringent" than the standard of review for a motion for JNOV, we further conclude that the trial court correctly denied Hero's alternative motion for new trial. *Dav*is, 00-0445, p. 10 (La. 11/28/00), 774 So.2d at 93.

**DECREE**

For the aforementioned reasons, we affirm the trial court's: (1) September 21, 2020 judgment denying, in part, Hero's Breach of Leases and Damages Motion; (2) entering the jury's verdict in a May 14, 2021 partial final judgment that Chevron as well as Chevron's assignees and lessees were not unreasonable and excessive; (3) entering the jury's verdict in a May 14, 2021 partial final judgment that there was no environmental damage on the Northwest Tract; (4) August 10, 2021 judgment denying Hero's Motion for JNOV that Chevron or Chevron's assignees' or sublessees' operations were unreasonable and excessive; (5) August 10, 2021 judgment denying Hero's Motion for JNOV that environmental damage exists on the Northwest Tract; and (6) jury instructions on Act 312.

**AFFIRMED**